## TOCH et al. v. ZIBELL DAMP RESISTING PAINT CO.

(Circuit Court of Appeals, Second Circuit. February 21, 1916.)

### No. 25.

PATENTS ⬤▬328—VALIDITY—PRIOR USE—METHOD OF TREATING CEMENT.

The Toch patent, No. 813,841, for method of treating cement and cement construction, which consists in applying to the surface of a Portland cement construction a liquid acid resin which, uniting with the free lime in the pores of such construction, forms a resinate of lime, making a hard surface impervious to water, etc., *held* void for prior public use of the treatment by another more than two years before the filing of the application.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by Henry M. Toch and another against the Zibell Damp Resisting Paint Company. Decree for defendant, and complainants appeal. Affirmed.

This cause comes here on appeal from a decree entered in the United States District Court for the Southern District of New York dismissing the bill of complaint. The facts appear in the opinion.

Kenyon & Kenyon, of New York City (Robert N. Kenyon, William Houston Kenyon, and Walter C. Noyes, all of New York City, of counsel), for appellants.

Merwin & Swenarton, of New York City (Timothy D. Merwin and W. Hastings Swenarton, both of New York City, of counsel), for appellee.

Before LACOMBE, WARD, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge. The United States granted to complainants on February 27, 1906, letters patent No. 813,841 of which they are still the sole and exclusive owners. The patent was issued for improvements in methods of treating cement and cement construction. The invention consists of a method of treating with a suitable organic acid or acid body a Portland cement construction for the purpose of making its surface "dust proof, oil proof, water proof and wear proof." The invention relates to the surfacing after setting of a Portland cement construction, and is largely employed in surfacing cement floors which are subject to wear and abrasion. This abrasion of the surface raises continuously a fine dust containing free lime, which is injurious both to health and to machinery. Any attempt to paint a Portland cement surface met the difficulty of the early peeling off of the paint,

due to the chemical action of the free lime upon the constituents of the paint, and it was generally understood that a Portland cement construction could not be successfully painted. Moreover, Portland cement construction, although hard and rocklike, is to a certain extent porous and for that reason non-water proof and non-oil proof. The Toch invention was intended to overcome these difficulties.

The patentee, Maximilian Toch, is a chemist of distinction and is connected with Columbia University and the College of the City of New York. After three years of experimental investigation of Portland cements and of resins he claims to have discovered that the modicum of free lime present in the pores is the root of the dust and paint-scaling evil. He invoked the known chemical reaction of free lime in the presence of acid resins to produce resinate of lime as a means to an end, and conceived the idea of applying with a brush a liquid acid resin to the surface of a Portland cement construction. He thus secured, after allowing time for penetration and chemical reaction, a resinate of lime to be formed in situ in the pores of the Portland cement construction, to a depth of from one-eighth to three-eighths of an inch, which filled the pores and consolidated the structure. Thus the cement structure and the resinate of lime structure constituted a new composite substance said to be non-porous, insoluble in oil or water, and mechanically more solid and resistant than the Portland cement construction alone. The practical result it is said was a substantially new composite surface upon Portland cement construction which was liquid proof and wear proof, dustless and strong; and which would hold paint permanently. The problem of surfacing Portland cement construction against wear, as for floor purposes, and against weather, as for wall purposes, and for receiving and retaining paint, it is claimed was thus solved by him. The invention has gone into practical use to a large and increasing extent.

It is not claimed that Dr. Toch discovered the reaction that takes place between lime and the acid resins. That it is admitted was well-known. And he did not discover the characteristics or qualities of resinate of lime by itself. That also was well known. But it is claimed that he did discover that, in the surface pores of Portland cement construction after setting, there is just that modicum of free lime to react in those pores with such quantity of liquid acid resins as will deeply penetrate the pores when externally applied and form resinate of lime in situ. This it does in such a way as to substantially integrate with the solid portions of the Portland cement construction itself, the resinate of lime extending down in rootlike forms in the pores of the Portland cement construction and solidly filling those pores—rock in rock—the whole producing a new composite surface partly Portland cement, partly resinate of lime mechanically strengthened and proof against abrasion and wear, and dustless, and at the same time liquid proof. And it is claimed that no one had ever actually done that thing or described that thing before.

Dr. Maximilian Toch describes his process in his specifications as follows:

"I first apply to the cement floor, wall, or other construction a filler prepared from a highly acid resin, such as Manila or copal gum. For the

preparation of the filler the resin is heated, together with a suitable vegetable drying oil or mixture of oils—as, for instance, linseed and chinawood oils—under conditions which will substantially avoid the loss of volatile resin acids. This heating is preferably effected in vacuo, although the method technically known as 'underheating' may be used. The heating is continued until solution is effected, after which a suitable diluent, as benzol, acetone, turpentine, or naphtha, is added. One or more coats of this filler may be applied to the cement. For the preparation of the second coating mixture the resin is heated under such conditions as to expel a portion of the volatile resin acids and an increased proportion of vegetable drying oil is used. The solution is diluted as above and is preferably mixed with a suitable pigment, as oxid of iron or zinc or sulfid of zinc in proper proportion to give the desired shade. The mixture so prepared will dry in about five hours to a hard and durable coating, in which no surface disintegration will occur, even after a long period of use."

The complainants aver that the defendant, without any license from them and in violation of their rights and in infringement of their patent, has wrongfully used and caused to be used and still is using the invention described in their patent. They ask for an injunction, preliminary and permanent, as well as profits and damages.

The defendant in an amended answer asserts (1) that Toch, the inventor, was not the first and original inventor of the alleged invention or improvement covered by the patent in suit, but that it was anticipated in the prior art; (2) that the alleged invention was not and is not an invention or discovery which could lawfully be made the subject of a patent under the statutes of the United States, in view of the prior public use.

The District Judge held the patent invalid because of two British patents which he regarded as anticipations of it, and on that ground dismissed the bill.

It appears that in 1884 a British patent, No. 5,237 was issued to Walley & Gare. The specification of that patent states that the invention consists:

"In protecting from damp, moisture or decay, and in varnishing and enameling and in some cases hardening or toughening stone, brick, tile, earthenware, cements, lime, and gypsum, plasters, metals, wood, fibrous materials, paper, yarns, threads, cords, ropes, and woven, knitted, and braided fibrous fabrics, by applying to or combining therewith a certain composition hereinafter described which is or may be made use of in reference to the said substances or materials by applying to the same as a varnish either alone or combined with ordinary paint or pigment.

"It is or may also be made to act when required as an enamel either alone or in combination with other known or suitable substances, when several coats of it are applied to the surfaces of the said substances or materials after the pores or interstices in such have become filled or saturated with it, and the said composition is or may also be made to harden or toughen more or less the said substances or materials (except metals) when they are soaked in or combined therewith. It is or may be applied to or combined with stone, brick, tiles, cement, lime or mortar, plaster or gypsum, or plaster of Paris, either before or after being built or formed into walls, structure, or articles.

"When applied as a varnish or enamel to metals it protects against damp, moisture, or atmospheric effects, and prevents rust and decay. When applied as a varnish to walls inside or outside it will prevent damp or moisture from passing either into or out of the wall, plaster, or cement. It will varnish, enamel, waterproof, and penetrate and harden or toughen paper, fibrous materials, and articles or manufactures made from same. It will act as a substitute for paint alone, or combined with paint or pigment, and also as a

substitute for varnish and enamel. The composition above referred to consists of resin-gum-thus, and spirit of petroleum, benzoline, or bisulphide of carbon, and also boiled linseed oil and sometimes a little India rubber or caoûtchouc."

The court below thought, as we have said, that the above patent amounted to an anticipation of the patent in suit. The Walley & Gare patent, however, is one of those characteristic English patents which this court has often had occasion to criticize, where a man who finds out that his device or preparation will accomplish something in certain relations draws on his imagination and suggests its use in numerous relations about which he knew nothing experimentally. In that patent we find the patentee enumerating 17 substances; for aught that is disclosed he may not have tried his composition on more than 2 or 3 of them. They are far from identical or even from being similar. There is a vast difference between metal and yarns, for example, and yet the patent is applicable. The patentee might as well have enumerated 27 or 57 substances. This court has always been loath to give a broad construction to such patents as that of Walley & Gare, and while "cements" is broad enough to include "Portland," it is not at all clear to us that in England in 1884 the patentees had Portland cement in mind. But in the view we take of the case at bar it is not necessary to dispose of it upon that point and we refrain from passing upon it.

The second patent considered is a British patent, No. 18,032, issued in 1901 to Heinrich Spatz of Berlin, Germany. In his specification Spatz says:

"It is well known as a great inconvenience of freshly whitewashed masonry that a very long time is necessary for the complete drying of the same, inasmuch as the carbonic acid contained in the atmosphere acts upon the lime and liberates water, forming at the same time carbonate of lime. The slowness of the drying process of such freshly coated walls of masonry is a great drawback in view of the final coating or the wall paper or the like having to be applied only after considerable time for drying has been allowed. Furthermore, it has been impossible to determine the completion of the drying process with any degree of exactness, which resulted in the inconvenience of coatings of paint, wall paper, and the like, if applied too early to the walls, becoming destroyed by moisture. Then the separation of moisture upon the surface of masonry induces the growth of fungi which are very detrimental to health. The object of the present invention is to prevent the formation of moisture, not only upon the freshly whitewashed walls, but upon wet masonry in general, so as to avoid the inconveniences arising therefrom. This is effected by producing an impervious coating upon the wet walls or the like it is desired to dry, this coating being impermeable to moisture and well-nigh invisible to the eye, and, being applied to the wet walls, makes it possible to coat the same immediately with the wall paper, paint, or the like."

He also states:

"Masonry which has been coated with any of these solutions, though it might be in a wet condition or freshly whitewashed, may be immediately covered with wall paper or any other coating, as the solvent rapidly evaporates, leaving the impervious lime salt behind. It is evident that my invention may be applied to wet and freshly whitewashed walls for basements, cellars, tunnels, and the like, and it is of great advantage also when used in combination with coatings in cement, mosaics, and others."

The court below thought the Spatz patent amounted to an anticipation of the patent in suit. The Spatz patent was accepted January 2,

1902. We believe that the Toch invention does not date back of March or April, 1902, when Maximilian Toch explained it to Baekeland. Maximilian Toch testified, it is true, that he conceived his invention in 1900 and disclosed the same to his brother in 1901. But upon the evidence it seems to us that Maximilian Toch was in 1900 and 1901 still experimenting and had not completed his invention. And if we are mistaken in this respect the evidence as to what Dr. Toch told his brother in 1900 and in 1901 is not sufficient to establish that actual disclosure of the invention which the law requires. As said by the Supreme Court in Clark Thread Co. v. Willimantic Linen Co., 140 U. S. 481, 11 Sup. Ct. 846, 35 L. Ed. 521 (1891):

"Such testimony, given for the purpose that this was, is necessarily subject to the gravest suspicion, however honest and well-intentioned the witness may be."

And see Taigman v. Forsberg, 223 Fed. 787, 139 C. C. A. 607 (1915); Greenwald Bros. v. La Vogue Petticoat Co., 226 Fed. 448, —— C. C. A. —— (1915).

This court does not question in the least the entire honesty and correct intentions of Dr. Toch. But the evidence is not sufficient under the rule governing such cases to establish the fact that Toch had completed his invention and disclosed it prior to the publication of the Spatz patent in England. The Spatz patent, in the concluding words of the specification, stated:

"It is evident that my invention may be applied to wet and freshly whitewashed walls for basements, cellars, tunnels, and the like, and it is of great advantage also when used in combination with coatings in cement, mosaics, and others."

This led the court below to find anticipation of the Toch patent for he concluded that the above phrase meant "coatings laid in cement, such as mosaics and similar coatings." In other words, the court below thought that under the Spatz description these mosaic coatings were to be themselves coated with the oleic acid solution. But we do not so understand the patent. Spatz never contemplated, in our opinion, the application of the oleic acid solution to the outside of the mosaic itself. He states that:

"Masonry which has been coated with any of these solutions, though it might be in a wet condition or freshly whitewashed, may be immediately covered with wall paper or any other coating."

Then he goes on to say that the invention is of great advantage also when used in combination with coatings in cements, mosaics, and others. The mosaics laid in cement are themselves the coatings that cover the already treated masonry. They are not themselves coated by anything. The Spatz patent was in our opinion correctly summed up by the expert, who testified that:

"It is evident * * * that the only object sought or accomplished by the process described in this patent is to prepare, by waterproofing, a surface of mortar (wet masonry) for receiving a coating of wall paper, paint, or mosaics. * * *"

Moreover, there could be no reason for applying the Spatz solution to a mosaic surface, for in mosaics the upper exposed surface con-

sists almost entirely of pieces of glass, earthenware, or stone. And the uncontradicted testimony of those .skilled in the art shows that mosaic coatings were not laid in Portland cement (to which the Toch patent applied), but that they were always laid in Keene cement, or in similar gypseous cement which contained no free lime. The cement in which mosaics are laid is practically covered up by them, and appears on the surface only in fine lines or cracks between the edges of the inlaid pieces. Even if Portland cement had been used and the Spatz solution applied, there would be no reaction between the latter and the inlaid pieces which form practically the whole surface; and if there were any reaction along the fine lines of the cement appearing on the surface, it would take place on such a small part of the surface that it would be wholly insignificant and negligible and useless. It did not teach the practical art how to treat Portland cement construction. Toch's patent relates to Portland cement construction. We agree, however, with the court below that the Spatz patent shows an understanding of the theory of the patent in suit, in that it discloses a knowledge of the chemical reaction taking place between the acid gum and the lime of the cements and mortars. As said by Judge Hand in the court below:

"He says that the 'lime combines with the carbonic gas in 'the air and forms carbonate of lime, but that in so doing it liberates water. Hence he wishes to form a lime salt which, being already chemically combined, will have no affinity with any of the elements in the air. He chooses, as an acid to unite with the lime base, oleic acid first and curiously enough resinous acids second. The resulting resinate of lime is exactly what Toch showed in his preferred example."

We also agree that if the Spatz process were applied to Portland cement it would act as the solution of the patent in suit does and produce the same result.

This brings us to the second defense, that of prior public use. The rule on this subject of prior public use is elementary. It is stated in Walker on Patents, § 71, as follows:

"Novelty is negatived by prior knowledge and use in this country by even a single person of the thing patented. This rule applies even to cases where that knowledge and use were purposely kept secret; and it applies no matter how limited that use may have been."

The law is clearly established that a single prior public use for more than two years prior to the application for the patent makes the patent void. Egbert v. Lippmann, 104 U. S. 336, 26 L. Ed. 755 (1881); Hall v. Macneale, 107 U. S. 90, 2 Sup. Ct. 73, 27 L. Ed. 367 (1882).

The defendant claims that it, or Zibell, its president, made public use of the Toch invention more than two years before the Toch application was filed. The testimony shows that in 1903 defendant furnished a material called protectorine to a contractor to be applied to the Portland cement walls of a squash court at the summer home of a Mr. Blair in Peapack, N. J., and that it was so applied. It is claimed that the material so furnished was like the protectorine now used by the defendant and which is alleged to infringe. The president of the defendant company testified that he began to manufacture protectorine in 1903, and made it in the same way now

that he used when he began making it in 1903. According to his testimony protectorine has a tendency to force itself deeply into the cement, to clog up the pores, and to make it as hard as stone. Having applied the protectorine to the cement, he was in the habit of giving to it a coating of paint or hard oil floor varnish. He found it adhered better, and was not injured by the acids which the cement contained. The testimony of the experts shows that the protectorine which is alleged to infringe consists almost wholly of resin, resin oil, or like products, dissolved in volatile thinners, and an oil such as linseed oil mixed with a pigment. The expert testimony shows that the second coat given to the Blair squash court in 1903 contained linseed oil and resin admixed with a pigment. Prior to the use of defendant's protectorine it appears that the parties had experimented on the squash court walls with a great many kinds of paint, ordinary and extraordinary, and that defendant's was the first that would even stay on. The walls were subject to a great deal of dampness and the paint previously tried had sloughed off. "It sagged and would not stay." A specimen of the wall was subjected to chemical analysis, and it corresponded to an ideal Portland cement mixture, being about one part cement to one part sand. And the analysis of the paint chips taken from the wall conformed to the analysis of the protectorine and paint now used by defendant.

The complainants endeavor to break the force of this testimony. They call attention to the fact that before defendant's protectorine was applied the walls had been scraped to rid them of the coats of paint which had been previously given to the walls in the unsuccessful attempt to paint them to which we have directed attention. They lay emphasis, too, on the fact that the walls had also been washed with turpentine, and then with washing soda, and finally with water. They would have us understand that walls so treated would be entirely changed in their nature, that the several coats of paint that were originally applied would be attacked by the free lime, and that the free lime would combine with some of the constituents of the paint and form a lime soap, thereby causing the paint to flake off, and that the result of this would be that most, if not all, of the free lime in the wall would be destroyed. They further say that washing the wall with turpentine would tend to carry into the wall such constituents of the paint as the turpentine could dissolve; that when the wall was next sponged with washing soda, if any of the free lime were left in the Portland cement, this washing soda, which is carbonate of soda, would unite with the free lime and convert it into carbonate of lime; and that the wall that would result from this would not be an ordinary Portland cement wall, but would have its pores already largely filled up with paint, and would have no free lime in it with which the resin acid of the protectorine could combine.

We are not impressed with the testimony in support of the above theory, especially in view of the fact that the complainants' witnesses did not analyze the cement taken from the Blair squash court, while the defendant's expert made such an analysis. The defendant's expert testified that the analysis showed that in the cement of the Blair walls

the free lime had been slightly increased over the average, as there was more actual lime, both combined and uncombined, by about 4 per cent., than is found in the ideal Portland cement, to wit, 66.6 as against 62.2. Moreover, as free lime is slightly soluble in water, and fresh linseed oil repels water, and turpentine does not mix with water, but repels it, we do not see how any substantial neutralization of the free lime could have occurred in the cement surface.

The testimony of the defendants' witnesses as to what was done to the cement walls at the Blair squash court and of their experts as to what their chemical analysis shows as to the cement walls and the nature of the protectorine then used and that it corresponded with that now sold by defendants is convincing coming as it does from persons of high standing. One of defendant's experts was one of the founders of and an assistant director in the Institute of Industrial Research at Washington. He had been educated as a chemist at Brown University and at the University of Pennsylvania, and for five years prior to the trial had been director of the scientific section of the Paint Manufacturer's Association of the United States. Another witness called by the defense had been educated as a chemist at the University of Berlin, and had received the degree of Doctor of Philosophy there. In this country he had been employed as a chemist by the largest manufacturers of dye stuffs in America. The complainants' expert, after stating that he had visited the house of Mr. A. Douglas Nash on Long Island in March of the year of the trial, and found that defendant was treating a Portland cement floor therein with its protectorine and waterproof paint, and that he had taken samples to his laboratory and made an analysis of them, testified as follows:

"The process which I saw carried out upon the cellar floor of Mr. Nash's residence at Flushing, L. I., by the defendant company on March 1, 1911, is the precise method specified in claims 1 and 2 of the patent in suit. It is the method of claim 1, because it consisted in treating a Portland cement construction by applying to the surface of the cement an organic acid or acid body which was suitable because it had the properties of and produced the results effected by the materials mentioned in the description of the patent; and it is the method of claim 2 because the particular organic acid or acid body used was an acid resin and because it was applied in the form of a solution."

The testimony satisfies us that the protectorine sold by defendant to-day and the process it employs is that which was used by it in 1903. And as complainants' own expert testified that the process used by defendant is substantially that used by complainants under the patent in suit we are compelled to hold the patent invalid.

Decree affirmed.

Judge LACOMBE heard the arguments, participated in the consultation, and indicated concurrence in the conclusions above expressed, but did not see the text of the opinion.