MAYER v. A. & H. G. MUTSCHLER et al.

(Circuit Court of Appeals, Second Circuit. February 14, 1918.)

No. 132.

1. PATENTS ⬉101—CLAIMS—CONSTRUCTION.
   One claim, or set of claims, cannot be helped out by judicial incorporation therein of other claims, or parts thereof, in the patent application.
2. PATENTS ⬉42—INVENTION—WHAT CONSTITUTES.
   Whether it is patentable novelty to change the old parts of a well-known machine depends on whether the result is new or merely an improvement.
3. EVIDENCE ⬉584(3)—WEIGHT AND SUFFICIENCY—REASONABLE DOUBT.
   Certainty beyond a reasonable doubt is reached by quality of evidence, and testimony of one witness may suffice, if the surrounding circumstances are confirmatory.
4. PATENTS ⬉328—VALIDITY—PRIOR USE.
   The Mayer patent, No. 1,043,021, for a machine for coating paper, mainly adapted for coating paper with carbon, etc., held invalid, for prior public use.
5. PATENTS ⬉76—VALIDITY—PRIOR USE.
   An inventor's sale of even one experimental machine is a disclosure to the public of the invention which is a defense to an action for infringement of the patent.
6. PATENTS ⬉76—VALIDITY—PRIOR USE—SALES.
   Though an inventor transferred by formal bill of sale an experimental machine, merely for the purpose of defeating his creditors, he cannot, where a patent subsequently issued was questioned on the ground of prior use, contend, for the purpose of defeating the rights of the public, that the bill of sale was in reality a mortgage.

Appeal from the District Court of the United States for the Western District of New York.

Suit by Charles W. Mayer against A. & H. G. Mutschler and others. From a decree (237 Fed. 654) for complainant, defendants appeal. Reversed and remanded, with directions.

The action is on claims 1 to 4, 7, 8, 14, 15, and 47 to 49, of patent to plaintiff, No. 1,043,021, applied for November 24, 1911, and issued October 29, 1912, for a "coating machine." The specification covers, as do the very numerous

⬉For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

claims, all the parts of a cumbrous and extended, rather than complicated, mechanism for surfacing paper with materials applied in fluid condition, so as to produce what is called "carbon," or "waxed," or "photographic," papers. In a general, but wholly true, sense, this art, which was far from new in 1911, consists in unwinding paper from a roll, leading it over guides and under suitable tension to a roller, whose periphery is partly immersed in whatever is to be applied to the paper, and thence past and over other guides, scrapers, and rollers hot or cold, as desired, until the finished product is rewound on the last roll. What is applied to the paper is "dope," and scrapers are also called equalizers, as they not only remove superfluous "dope," but (in some forms at all events) produce a more equal or even distribution of the proper quantum thereof. Paper may be thus coated on one or both sides; the latter process requiring two "dope" or "coating" rollers and other duplications of process.

The machine of the patent and that of defendants are of the above general type, which is old and open to the public. After the paper is coated, there is an obviously natural tendency to crease or rumple; and smoothing rolls have long been used to counteract that inclination. The appearance and perhaps nature of the coating is affected by the application of heat or cold, or (perhaps) mere exposure to the air at workroom temperature. Thus, if the hot fluid that stuck to the paper as it passed through the "dope" is speedily chilled, it will not soak in as much as if kept warm, and will have a "gloss," instead of a "dead finish," and the quality or appearance of finish may be changed by differing forms of scrapers or equalizers; e. g., a striated circular revolving equalizer will remove superfluities, so will a knife edge, but the appearance of the coated papers will not be the same.

These and many other details of manufacture, and possibilities of variance in product, the specification deals with. For the purposes of this case, it suffices to say that plaintiff discloses a peculiar form of equalizer which defendants do not use, and then points out "that the special and precise positions of the dope roll, the equalizing bar and the releveling or smoothing roll is of special importance in a machine of the present type. The coated paper, while still hot from the coating roll, passes immediately and directly to the equalizing bar without coming in contact with any other object. * * * Then, before the paper with its coating has time to chill, it is brought into engagement with the smoothing roll, which acts on it to produce the desired surface"—i. e., it is hot or cold, as desired. But nowhere does the specification give any information as to how near or far apart rolls and equalizer should be, nor are the words "immediately" and "directly" translated into feet or inches, nor is the idea expressed in terms of the size of, or speed of travel of, the paper web.

Of the claims in suit, Nos. 1 to 4 cover, in language varying but little, the disclosure above outlined. The first is as follows:

"1. A machine for coating paper, comprising means for feeding paper under tension, means for coating the paper as it is fed, an equalizing device adjacent said coating means arranged to receive the paper therefrom before it touches another object, and a roll for releveling and smoothing the paper arranged to receive the paper web directly from the equalizing device, said roll being arranged adjacent said equalizing device."

Nos. 7, 8, 14, and 15 add to the idea of adjacency that of adjustability of the equalizer with reference to that which is adjacent. The fourteenth is perhaps the broadest, and is as follows:

"14. A paper coating machine, comprising a coating roller, means for feeding a paper web in contact therewith, an equalizing bar adjacent said roller in position to receive the paper directly therefrom before it contacts with another body, and means for adjusting said bar to vary its relation to the coating roller."

Nos. 47 to 49 make no reference to any new adjacency of parts, nor the adjustability of any part, and are an attempted summary of the whole apparatus, or its method of working. The forty-eighth is typical, and is as follows:

"48. A paper coating machine, comprising a frame, coating mechanism mounted therein, tension rollers for continuously feeding the paper, and a

separate winding roll receiving the paper from said tension rollers, said winding roll having a relatively light friction drive for the purpose stated."

The alleged infringement is a machine, with a similar coating roll (which any one can use), the scraper or knife of the prior art, and a smoothing roll which as matter of fact has been "run neutral"—i. e., without either heating or cooling, but is obviously so made that heat or cold might be applied by the use of long-known apparatus. The fact seems to be that plaintiff's disclosure describes what is wanted to make carbon paper for (e. g.) typewriters, while defendants' machine has been actually used in producing waxed paper wherein to wrap bread. If defendants wanted to make carbon, we see no reason why their smoothing roll could not be changed to suit by any competent mechanic.

The two rolls and scraper of defendants are quite close together, we assume as nearly juxtaposed as in machines made by plaintiff and said to embody his patent; but, as above pointed out, it is impossible to discover from the specification the measurements of such juxtaposition. In defendants' apparatus, however, the paper ribbon is touched on its way from dope roll to scraper by an idler roll, which plaintiff insists has no function but to create an appearance of noninfringement. We find, however, that it (being adjustable) regulates the touch of paper to dope roll, making it light or heavier as desired. Nevertheless it is true that the lead of the paper could easily be governed in other ways, and such interposition of an adjustable idler roll could be avoided by the exercise of quite simple mechanical skill, if and whenever the machine owner wanted to do away with it.

Overruling, not only the usual defenses of anticipation and lack of patentable invention, but several alleged prior uses as to which the testimony was largely taken by deposition, the trial court found infringement of all the claims in suit.

G. Willard Rich, of Rochester, N. Y., for appellants.

Eugene L. Dominick, of Buffalo, N. Y., for appellee.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above).   [1] Claims 47–49 seem to us to have been recognized as valid by inadvertence, for as to them we agree with plaintiff's very distinguished expert, who frankly said that, since the relative positioning of rolls and equalizer was not made a positive element in these claims, "some of the references of the prior art read directly on" them, unless the court could "read into" them the relative positioning aforesaid as "producing a definite result."  We know no method by which one claim or set of claims can be helped out, by judicial incorporation therein of other claims or any part thereof; nor in this instance is it doubtful that the subject-matter of 47–49 is quite different from that of the others in suit.  Since they are proved as anticipated by plaintiff's own evidence, we need pursue the matter no further.

[2] As to the other claims, we cannot doubt, nor is it denied, that whatever inventive thought is in them lies in bringing nearer together the coating and smoothing rolls, and interposing a scraper into that minimized space.  How much nearer these old tools of many prior art machines were brought by Mayer we cannot know from the specification; and this implied criticism on the sufficiency of the disclosure is sought to be avoided by saying (as do plaintiff's expert and counsel) that what the patentee did was to abolish the "cold zone" —i. e., the distance between edge of dope pan and axis of smoothing roll—by reducing said distance to about 11 inches, thereby ironing out

248 F.—58

(so to speak) the coated paper before, either by atmospheric exposure or contact with other rollers, any substantial change could take place in the physical or chemical condition of what had been applied to the paper. "Cold zone" is one of those advertising phrases, unknown to the patent, and invented to aid it, of which we have spoken before. Sundh, etc., Co. v. General Electric Co., 244 Fed. 169, 156 C. C. A. 591. What is patented here is not a condition or result, nor even a method or process, but a machine; i. e., the means of making something. And the question of invention is just this—was it of patentable novelty to reposition the old parts of a well-known machine, if the change produced either a new or an improved result? The answer to this query depends on whether the result is new or merely an improvement, whether the difference obtained is one of kind or of degree. Seymour v. Osborne, 11 Wall. 516, 20 L. Ed. 33; Railroad, etc., Co. v. Elyria Iron, etc., Co., 244 U. S. 285, 37 Sup. Ct. 502, 61 L. Ed. 1136. This question of fact we shall not attempt to resolve, and have stated it only to emphasize the definition of whatever invention can be claimed.

There are two points on which we feel constrained to differ with the court below, each of them dispositive of this case:

[3, 4] 1. Mayer has long made coating machines; indeed, this is not his first patent. In 1907 he sold several machines to a company managed by one Archbald, who is still in business, and is himself a mechanic, if not an inventor. Archbald had and has machines of makes other than Mayer, and experimented in changing and adapting his stock of tools. He made and still has what in this record is called the "18-in. machine," because that is the size of paper for which it is designed, and we find that that apparatus was finished and used by August, 1908; has coating and smoothing rolls close together, with scraper (and nothing else) interposed, so that the paper is not touched by any other object in its journey from dope roll to scraper, and scraper to the next adjacent roll.

The rules as to prior use are severe, and rightly so, and Archbald is a witness hostile to plaintiff; but the existence of the machine is not denied, its date of erection proved by other testimony than Archbald's, as also is its unchanged condition, and still another witness swears that it was in 1911 as it is now.

Certainty beyond reasonable doubt is reached by quality of evidence, and much depends on the nature of the thing sworn to. One witness may suffice (Tompkins v. N. Y. Woven Wire, etc., Co., 159 Fed. 133, 86 C. C. A. 323) if the surrounding circumstances are confirmatory; here are more witnesses than one, and we regard the circumstances as highly corroborative. The machine in question was designed for small work (it is also called the "little" machine in the record), and it is to us a most natural thing, in such a device, to abolish for lighter work idlers and guides used in larger apparatus, and compress the whole mechanism. Nor is the matter complex or difficult of statement, nor easily confused in memory. The machine is simple, and its simplicity strongly assists belief in the statements that it has been what it is now since a date more than two years before Mayer's application.

[5, 6] 2. The patentee made in 1908 a machine for production of carbon paper, known in this record as the "Stull machine." The coating and smoothing rolls were apparently nearer together than in Mayer's earlier machines, and there were interposed two equalizers, and an adjustable guide roll, functioning exactly as does the idler of defendants' apparatus. The testimony is vague, but we may adopt as most favorable to plaintiff the statement of his expert that the distance from "double scraper" to smoothing roll was 10 to 15 inches.

It is too plain, to require more than statement, that, if this machine is prior art, there was no invention in abolishing one scraper and the guide roll, and making the remainder more compact by moving slightly closer coating and smoothing rolls. But, if greater importance be attributed to the suppression of guide roll, then it will not lie in plaintiff's mouth to allege infringement against defendants, who have that very thing.

We think the obviousness of the foregoing is the reason why the contest at trial was not over the similarities or differences of the Stull machine and that of the patent, but on the question as to whether that device was anything more than an experimental use within the rule of Elizabeth v. Pavement Co., 97 U. S. 126, 24 L. Ed. 1000.

That Mayer was experimenting and seeking to improve his product, whether of machines or paper, is not doubted, and it is admitted that the machine described in the patent is an improvement upon many earlier Mayer machines, including the so-called Stull apparatus. The patentee took, doubtless, one step at a time, and kept his machine's secret as much as possible; but, of course, he could not sell even what he reminiscently calls an experimental machine without making whatever the thing sold contained known to the public. One sale is a public use of whatever is parted with (Delemater v. Heath, 58 Fed. 414, 7 C. C. A. 279; Covert v. Covert [C. C.] 106 Fed. 183, affirmed 115 Fed. 493, 53 C. C. A. 225; Toch v. Zibell, etc., Co., 231 Fed. 716, 145 C. C. A. 597), even though what the purchaser got was imperfect, and subsequently greatly improved on (Star, etc., Co. v. Crescent, etc., Co., 179 Fed. at 859, 103 C. C. A. 342). We assume that the embodiment of the patent in suit is a much better machine than what Mayer made in 1908; but since that earlier machine would, if later, have infringed as plainly as does defendants', and for the same reasons, in respect of the narrow range of claims here in suit, the sole question is whether what occurred amounted in law to a sale.

In 1908, Mayer was impecunious, and apparently harassed by "supplementary proceedings" under the New York practice, something which justifies the assumption that he was a judgment debtor. Stull was a member of the bar, who had loaned Mayer money and had an agreement with him by which Mayer was to make carbon for Stull, presumably on the "Stull machine," and perhaps others. Mayer had also obtained money from his wife, and in September, 1908, executed a chattel mortgage to her, which covered what is known herein as the Stull machine. In the following November Mayer gave Stull a formal written transfer or bill of sale of the same machine, subject to his wife's mortgage, and she contemporaneously released the machine from the lien thereof. Five months later Stull as owner and in writ-

ing leased said machine to Mrs. Mayer, and she undoubtedly permitted her husband to make coated paper upon it, which was sold.

Plaintiff now contends that this tangled web was no more than a device to secure Stull for loans; that in effect he was but a mortgagee. As between the parties this may be true, though we do not so find. The point is immaterial, because what decides is the legal effect of the contractual acts of the parties and the resulting rights of the public. Stull became in 1908 the owner of this machine, of which the test is this: Any creditor of Stull could have levied on it, and Mayer would have been helpless; therefore the transaction was in law a sale—i. e., a transfer of title and property. Though relating to a chattel, we need not inquire whether there was a change of possession, for the law of New York was complied with by the papers executed and delivered. Quite probably part of the reason for this apparatus of documents was to prevent Mayer's creditors from reaching the property; but, just as the parties could not have turned the transaction into a mortgage to defeat Stull's creditors, so they cannot now do it to defeat the rights accruing to the public by the formal sale to Stull.

Therefore there was, by the Stull sale, public use, as that term is interpreted, of a machine which would infringe the claims in suit, if later than the patent; the act occurred more than two years before application, and the claims are thereby invalidated.

Accordingly the decree is reversed, and case remanded, with directions to dismiss the bill, with costs in both courts.