## BEEMAN v. GEORGIA CASUALTY CO.
### No. 1287—5759.

Commission of Appeals of Texas, Section B.
July 22, 1931.

**40**

E. H. Cavin, of Houston, and Thomas C. Turnley, of Galveston, for plaintiff in error.

Frank S. Anderson, of Galveston, for defendant in error.

LEDDY, J.

H. J. Hetkes, a paving contractor, was a subscriber under the Workmen's Compensation Law; the policy of insurance covering his employees was issued by defendant in error.

Plaintiff in error brought this suit against the defendant in error to set aside an order of the Industrial Accident Board by which he was denied compensation for personal injuries alleged to have been sustained while he was driving a team in the course of his employment with Hetkes.

Defendant in error's defense to the cause of action thus asserted was that plaintiff in error was not, at the time he was injured, an employee of Hetkes, but was in the employ of Frank Jones, an independent contractor.

The case was tried to a jury and submitted upon special issues. The jury answered all special issues in favor of plaintiff in error. The only substantial question presented involves the finding made by the jury that at the time plaintiff in error received this injury he was an employee of Hetkes.

The trial court entered judgment in favor of plaintiff in error in accordance with the findings of the jury, awarding him compensation for total and permanent disability at the rate provided for in the compensation act. This judgment was reversed and rendered by the honorable Court of Civil Appeals of the First District, 24 S.W.(2d) 799, on the ground that there was no evidence of probative force to show that plaintiff in error was employed by Hetkes at the time he received the injuries for which compensation was awarded.

It appears that Hetkes had a contract with the city of Galveston to pave certain streets. In order to do this work, it was necessary that he use a number of teams in moving the dirt therefrom. He entered into a contract with Frank Jones to furnish teams at eighty-seven cents per hour, which were used in performing this work.

On the day plaintiff in error received his injury, a team harnessed to a wagon was hitched on Twenty-Ninth street a few blocks from where the street grading work was being done. Plaintiff in error testified that Frank Jones told him to get on this wagon and drive the team down to where the street was being prepared for paving, and that he would find a man there who would tell him what to do. He thus describes the circumstances under which he was engaged to do the work he was performing at the time he was injured:

"I saw that team first that morning down on 29th street. I saw it at 29th and N1/2. The team wasn't doing anything when I first saw it; that was something after eight o'clock. The team wasn't working, and there was nobody with it, it was just standing still. It was standing at N ½, 29th and N ½. The men were there and they had gone to work that morning when I first saw the team. Nobody didn't tell me to go there that I knows of, nobody, I was looking for work. I said awhile ago that somebody told me to go down there and I could get work, the people standing up there that I talked to about it said I could go down there and get a job; and I went down there looking for work. I found this team without a driver. There was nobody around the team when I first saw it. I did get up on the wagon and went to work. I went to driving the team; I was told to go to driving the team. Mr. Roy told me to go to driving.

"The men on the works called him Mr. Roy. I know he taken me and carried me to the hospital. I heard him called Mr. Roy before he taken me to the hospital. I haven't seen Mr. Roy today. I didn't pay any attention to him if I did see him. I think I would know him if I saw him again, he was a stout, fat-looking man. He was a white man, he wasn't black. I cannot really tell you how he was dressed, I didn't pay that much attention to his clothes at all.

"When he first came up there and spoke to me, I didn't know what his name was, but I heard him called 'Mr. Roy,' and he told me, he said 'go over there and go to work.' He told me to get down on the side of the street where they were hauling the dirt from; he told me to work down there in the ditch where they were grading.

"As to whether he told me to get up on the wagon, I will say, I was already on the wagon. I did not get up on the wagon before he talked to me, no, when I drove up there he told me 'to go over there and get a load.' He put me to work and I drove the team up there. A man told me to get on the wagon and drive the team down there and I would find a man to tell me what to do. Yes, sir, a man, Frank Jones, told me to get on the wagon and drive the team down there. Mr. Roy didn't tell me to get on the wagon and drive the team down there, he told me to 'go to work.'

"As to my driving the team for Frank Jones, I will say, I was not driving the team for Frank Jones as I knows of, he told me to go down there and I would find a man down there and the man would put me to work. Frank Jones told me that, and I went on down there and did find a man. Frank Jones told me to get on the wagon and drive the team down there and I would find a man and he would find something for me to do, he would tell me what to do. I don't know where Frank Jones went to.

"Frank Jones did not tell me they would

pay me 40 cents an hour, he didn't tell me anything about what they would pay me. When I went down there I asked him what they were paying and he stated they were paying 40 cents an hour, I asked a white man, I told you. The white man was Mr. Roy, and he said they were paying all of them 40 cents an hour; and he said I was getting the same as all the rest of them were getting. He said I was going to be paid 40 cents an hour for driving the team, Mr. Roy told me that. Frank Jones just told me to get on the wagon and drive the team down there and they would tell me what to do."

On cross-examination, he testified as follows:

"I know Jones when I see him. Have seen him at this trial. After I was taken to the hospital I don't know whether Jones came out there to see me or not. I didn't see him if he was out there to see me; I didn't have a talk with him. I didn't have a talk with him that I knows of; he didn't ask me how I came to be driving that wagon. I didn't tell him that a boy by the name of Sonny sent me over there to go to work. I didn't know a boy by the name of Sonny.

"After I got on the wagon and drove this team, Mr. Roy told me what to do; he told me when I went down there; when I went to the job. I said yesterday that Jones told me to get on the wagon, that is the time when I took the wagon from there, he didn't hire me, Jones didn't say anything about hiring me, he said 'take that wagon and go down there, they will tell you what to do.' Mr. Roy was down on the job and Mr. Jones at 29th and M ½ and I didn't see him any more. The job was there on 29th street. When Jones told me to take the wagon he told me they would tell me what to do, and that I would find it down on the Hetkes job. The men were working right there on 29th and Q, the street was not torn up at M ½ and 29th."

Roy Colville testified that he was general foreman for Hetkes; that his duty was to superintend the preparation of Twenty-Ninth street for paving, and that Hetkes had this job under contract with the city of Galveston. He denied that he employed plaintiff in error, or that he had authority to employ or discharge any laborers working under his direction. He asserted that Hetkes had sole authority to employ the men engaged in preparing the street for paving. Colville was positively identified as the man called "Roy" to whom plaintiff in error claimed to have applied for employment.

The Court of Civil Appeals concluded the evidence showed as a matter of law that there was no contract of employment, either express or implied, between plaintiff in error and Hetkes. It further held that, if the testimony should be deemed sufficient to raise the issue of plaintiff in error's employment by Colville, the undisputed testimony of both Hetkes and Colville showed Colville was not authorized to enter into such contract of employment.

■ We do not agree with either conclusion upon which the Court of Civil Appeals based its decision in reversing and rendering this case. It is true, as asserted by that court, that Hetkes and Colville each testified the latter did not possess authority to employ labor on the work which he was superintending. We think, however, the circumstance that Colville was Hetkes' general foreman or superintendent in charge of and directing this work, coupled with the fact that he did assume the authority to employ plaintiff in error and fix his compensation, was sufficient to raise the issue as to whether he had been clothed with authority to employ laborers in connection with the work in which he was engaged.

■ The issue as to whether Colville was authorized to employ plaintiff in error was not submitted to the jury, nor was any request made for its submission. In support of the judgment, it will therefore be presumed that the trial court found this issue favorably to plaintiff in error. Article 2190, R. S. 1925; Ormsby v. Ratcliffe, 117 Tex. 242, 1 S.W.(2d) 1084.

■ If it be assumed, however, that Colville was not authorized to enter into the contract of employment testified to by plaintiff in error, still, we think his agreement to employ Beeman was binding upon his principal, Hetkes. He admits that he was Hetkes' general foreman or superintendent in charge of and directing the preparation of the street for paving. "Whenever a principal," says Ruling Case Law, volume 21, § 34, "has placed an agent in such a situation that a person of ordinary prudence conversant with business usages, and the nature of the particular business, is justified in assuming that such agent is authorized to perform in behalf of his principal the particular act, and such particular act has been performed, the principal is estopped from denying the agent's authority to perform it." As said by the Supreme Court of the United States, in Union Mut. Life Ins. Co. v. Wilkinson, 13 Wall. 222, 235, 20 L. Ed. 623: "The powers of the agent are, prima facie, co-extensive with the business intrusted to his care, and will not be narrowed by limitations not communicated to the person with whom he deals."

Tested by these legal principles, the employment by Colville of labor and teams necessary to complete the work he was engaged in performing was within the apparent scope of his authority. At any rate, the issue was raised by the evidence and, for reasons given above, will be presumed to have been

determined by the trial court in favor of plaintiff in error.

Frank Jones, the teaming contractor, also denied he had employed the plaintiff in error, or that he directed him to take the team and apply to Colville for employment. According to the testimony offered by defendant in error, this negro took the team belonging to another, without the owner's knowledge or consent, and began work on the paving job without being directed to do so by any one in charge, and without any agreement as to his compensation. The jury may have and probably did conclude that plaintiff in error's version that he was directed by Colville to go to work and he would be paid forty cents per hour for his labor was more reasonable than the theory presented by the testimony offered by defendant in error.

■ Where the evidence presents two conflicting theories, of which one is unreasonable and the other appears to be reasonable and probable, though supported by lesser evidence, it is within the province of the jury in passing on the credibility of the witnesses and of the weight to be given their testimony to give credence to the testimony which appears more nearly to comport with reason and human experience. Braunschweiger v. Waits, 179 Pa. 47, 36 A. 155; Green v. Maloney, 7 Houst. (Del.) 22, 30 A. 672; Mayer v. A. & H. G. Mutschler, 248 F. 911, 161 C. C. A. 29.

■ We conclude that the positive testimony of plaintiff in error, considered in connection with all the facts and circumstances surrounding the transaction, was sufficient to sustain the jury's finding that at the time of his injury he was an employee of Hetkes.

We recommend that the judgment of the Court of Civil Appeals be reversed, and the judgment of the trial court affirmed.

CURETON, C. J.

The judgment of the Court of Civil Appeals is reversed, and that of the district court is affirmed, as recommended by the Commission of Appeals.