## GEORGIA CASUALTY CO. v. BEEMAN.
### No. 9374.

Court of Civil Appeals of Texas. Galveston. Jan. 17, 1930.

Rehearing Denied Feb. 13, 1930.

Frank S. Anderson, of Galveston, for appellant.

Thos. C. Turnley, of Galveston, and E. H. Cavin, of Houston, for appellee.

PLEASANTS, C. J. This is a suit by appellee against appellant to recover upon a bond executed by appellant under the Employers' Liability Act (Rev. St. 1925, arts. 8306–8309, as amended) of this state to secure compensation alleged to be due appellee as an employee of H. J. Hetkes, a paving contractor.

The petition alleges the execution of the bond by appellant, the employment of appellee by Hetkes, and appellee's injury on October 24, 1927, while driving a wagon in performance of the duties of his employment.

In addition to a general demurrer and general denial the defendant presented the following plea:

"Further answering herein the defendant alleges upon information and belief, and has reason to believe that one H. J. Hetkes entered into a contract with one Frank Jones, as an independent contractor, by the terms of which said contract the said Frank Jones agreed to haul and place certain materials for the said H. J. Hetkes in and about the construction of a certain pavement on Twenty-ninth Street in the City of Galveston, Texas; that the said Frank Jones, as such independent contractor, had sole and exclusive control and direction over all of his employees, and paying their wages, in and about the performance of said work, and that the said subscriber, H. J. Hetkes, dealt exclusively for such work and services with the said Frank Jones, depending solely upon him for the proper doing of the work which the said Frank Jones, as such independent contractor, agreed to perform; that the plaintiff voluntarily assumed the driving of one of said teams without authority or any implied promise of remuneration from either said Jones or H. J. Hetkes or his agent thereunto authorized; and that if it should be held that the plaintiff was an employee of the said Frank Jones, as that term is defined in the Employers' Liability Act of the State of Texas, the defendant in either case is in no way liable for any injury sustained by the plaintiff."

The trial in the court below resulted in a verdict and judgment in favor of appellee.

The cause was submitted to the jury upon special issues. In response to the first and second issues submitted, the jury found, that, at the time of his injury the appellee was an employee of H. J. Hetkes, and that he was injured in the course of his employment.

At the close of the evidence the defendant asked the court to instruct the jury to return a verdict in its favor, which request was refused by the court. The first assignment complains of this action of the court.

The undisputed evidence shows that appellee was injured on October 24, 1927, as alleged in his petition, while driving a wagon being used in removing shell or gravel from a street in the city of Galveston upon which H. J. Hetkes, under a contract with the city, was preparing to construct a concrete pavement, and that appellant had executed a bond under our Employers' Liability Act to compensate Hetkes' employees for injuries received in the course of their employment.

Hetkes, a witness for plaintiff, testified:

"James Beeman was not in my employ in the month of October, 1927. I had not hired him as a laborer or as a teamster at any time during that month; or at any time prior to that. The plaintiff had never been in my employ while I was engaged in the execution of that contract. I had never paid him any wages.

"I had a foreman on that job in October, 1927, who was partly in charge there; my foreman's name was Roy Colville.

"I did not have a colored foreman by the name of Frank Jones. Frank Jones did not work for me in October, 1927. He furnished teams at times for hauling shell for the City of Galveston. I paid Frank Jones so much per hour for the teams he furnished, on a contract.

"I know of a colored man by the name of John Green; this man John Green, during October, 1927, had no connection whatsoever with me. I never did have any teams from him.

"I do not know anything about how many teams this man Jones has. Sometimes on that job he would furnish one team and sometimes fifteen; it is hard to tell, that would be the general run.

"I was the contractor doing the work. I had a contract to do the work with the City of Galveston. I contracted teams from Frank Jones. I got all my teams from him as a rule. I did not have any teams of my own. I did not get any teams from anybody except Frank Jones.

"I stated that I contracted with Frank Jones to furnish me teams for hauling shell. I never did hire or discharge any teamsters on those teams; I never did pay any teamsters any wages. I said I paid Jones by the hour, so much per hour for each team as it worked.

"A city inspector, employed by the City of Galveston, directed the teams as to the manner of doing the work as to where they would take the shell. I had nothing to do with their work.

"I do not own any team myself. I use teams in my contracting work a good many times. I contract with someone to furnish them to me. I never did contract with John Green to furnish teams to me. I never did use any of John Green's teams on any of my contracts to my knowledge.

"I said I contracted with people to furnish me teams; and I further stated that I didn't understand what you meant when you asked me if I 'rented' any teams, and at the request of counsel, I will explain the distinction I am drawing there; from time to time it is necessary to have teams on public work, or any other work that I have, and I will go to several contractors who have teams and I will contract for them at so much per hour. The fellow that gives me the cheapest contract gets my work the same as when I am the cheapest I get the contract. I do not rent those from him, I contract them at so much per hour; on a basis of so much per hour, strictly a contract proposition.

"It is not a fact that that character of arrangement which I denominate as 'contracting' these teams, that I make that arrangement for the purpose of making it appear that the people who owned the teams are independent contractors in order that I may avoid liabilities under this policy of insurance, or attempt to do so.

"The name of the foreman on the job at 29th street was Roy Colville.

"I have been interrogated as to whether I contracted for these teams for the purpose of avoiding liabilities, and to make it appear that the owners of the teams were independent contractors, I had no such idea in mind when I contracted for the teams. The reason I contract for the teams is to get a low price, that is all. In fact they all come to me and ask me to give them permission to make bids and the lowest man gets it.

"I do have automobile trucks of my own, lots of them. I employ the drivers for those automobile trucks. They were engaged at different times in the work which I was performing most all of the time. Those men were all under my direct employment. It is a fact that I did not always need teams in doing the work I was performing; just at times. It wasn't really up to me when the city inspector said 'I want so many teams' I would get them for him. Some days I wouldn't have any teams at all, and other days I would have a good many.

"I testified that I contracted with Frank Jones for teams on the 29th street job, he gave me the best bid. The price he gave me was 87½ cents per hour. I paid him that price per hour for the teams I contracted with him for him to furnish; for any and all teams he furnished.

"I have already testified that I had nothing to do with hiring the men on those teams. I had nothing to do with discharging them, or the manner in which they did their work, that was up to Jones. That was all up to Jones and the City inspector. I did not pay the City inspector.

"The city inspector instructed the teams and teamsters where to get the material and where to place it, if he did not, I would not receive pay for it; he absolutely did that. I had nothing to do with the manner in which they did their work.

"As to my not knowing then as to who did the directing of these teams, of my own knowledge, I will say, absolutely, I know when the teams are on the jobs, the city inspector does the directing at all times and no one else does. I was not on this job at that time. My foreman does not direct the teams on any job. The city inspector does the directing of the teams, he tells them what shell to take, that is all they handle, and where to take it to. The city paid me under my contract. They were paying me for the hauling of that shell."

James Beeman testified in his own behalf as follows:

"My name is James Beeman. I am about sixty years old. I have been in Galveston County for fourteen years.

"In the month of October, 1927, I was working at the time I got hurt. I had been working for about two hours before I got hurt.

"As to how I happened to get the job out there where I got hurt that morning, I will say, I went down there and they sent me down on 29th and Q. They sent me down to 29th and Q and told me that I would find somebody down there that would put me to work. Well, Mr. Roy put me to work. Mr. Roy was a white man. After Mr. Roy put me to work, I had worked about two hours when I got hurt. Mr. Roy said he was going to pay me 40 cents per hour.

"I have not talked a good deal about this case; I have not had anything to say about it, I had nothing to talk about it. I never talked it over with Mr. Turnley. I had no talking to do. I saw him but slightly. I have not talked it over with anybody else besides Mr. Turnley, I had nothing to say about it.

"I saw that team first that morning down on 29th street. I saw it at 29th and N ½. The team wasn't doing anything when I first saw it; that was something after eight.

o'clock. The team wasn't working and there was nobody with it, it was just standing still. It was standing at N ½, 29th and N ½. The men were there and they had gone to work that morning when I first saw the team. Nobody didn't tell me to go there that I knows of, nobody, I was looking for work. I said awhile ago that somebody told me to go down there and I could get work, the people standing up there that I talked to about it said I could go down there and get a job; and I went down there looking for work. I found this team without a driver. There was nobody around the team when I first saw it. I did get up on the wagon and went to work. I went to driving the team; I was told to go to driving the team. Mr. Roy told me to go to driving.

"The men on the works called him Mr. Roy. I know he taken me and carried me to the hospital. I heard him called Mr. Roy before he taken me to the hospital. I haven't seen Mr. Roy today. I didn't pay any attention to him if I did see him. I think I would know him if I saw him again, he was a stout, fat-looking man. He was a white man, he wasn't black. I cannot really tell you how he was dressed. I didn't pay that much attention to his clothes at all.

"When he first came up there and spoke to me, I didn't know what his name was, but I heard him called 'Mr. Roy' and he told me, he said 'go over there and go to work.' He told me to get down on the side of the street where they were hauling the dirt from; he told me to work down there in the ditch where they were grading.

"As to whether he told me to get up on the wagon, I will say, I was already on the wagon. I did not get up on the wagon before he talked to me, no, when I drove up there he told me 'to go over there and get a load.' He put me to work and I drove the team up there. A man told me to get on the wagon and drive the team down there and I would find a man to tell me what to do. Yes, sir, a man, Frank Jones, told me to get on the wagon and drive the team down there. Mr. Roy didn't tell me to get on the wagon and drive the team down there, he told me to 'go to work.'

"As to my driving the team for Frank Jones, I will say, I was not driving the team for Frank Jones as I knows of, he told me to go down there and I would find a man down there and the man would put me to work. Frank Jones told me that, and I went on down there and did find a man. Frank Jones told me to get on the wagon and drive the team down there and I would find a man and he would find something for me to do, he would tell me what to do. I don't know where Frank Jones went to.

"Frank Jones did not tell me they would pay me 40 cents an hour, he didn't tell me anything what they would pay me. When I

went down there I asked him what they were paying and he stated that they were paying 40 cents an hour, I asked a white man, I told you. The white man was Mr. Roy, and he said they were paying all of them 40 cents an hour; and he said I was getting the same as all the rest of them were getting. He said I was going to be paid 40 cents an hour for driving the team, Mr. Roy told me that. Frank Jones just told me to get on the wagon and drive the team down there and they would tell me what to do."

James Beeman, plaintiff, testified on cross-examination as follows:

"I know Jones when I see him. Have seen him at this trial. After I was taken to the hospital I don't know whether Jones came out there to see me or not. I didn't see him if he was out there to see me; I didn't have a talk with him. I didn't have a talk with him that I knows of; he didn't ask me how I came to be driving that wagon. I didn't tell him that a boy by the name of Sonny sent me over there to go to work. I didn't know a boy by the name of Sonny.

"After I got on the wagon and drove this team, Mr. Roy told me what to do; he told me when I went down there; when I went to the job. I said yesterday that Jones told me to get on the wagon, that is the time when I took the wagon from there, he didn't hire me, Jones didn't say anything about hiring me, he said 'take that wagon and go down there, they will tell you what to do.' Mr. Roy was down on the job and Mr. Jones at 29th and N ½ and I didn't see him any more. The job was there on 29th street. When Jones told me to take the wagon he told me they would tell me what to do, and that I would find it down on the Hetkes job. The men were working right there on 29th and Q, the street was not torn up at N ½ and 29th.

"They went to work at eight o'clock in the morning. I could not tell how long after I got on the job before I saw Mr. Roy; I cannot because I didn't have no watch."

Roy Colville, the witness for defendant, testified:

"My name is Roy Colville. I live in Galveston and have lived here for six years this February. I am employed by H. J. Hetkes. I was employed by H. J. Hetkes in October, 1927, as foreman on the 29th street paving job.

"At that time Mr. Hetkes was engaged in the execution of a contract with the City of Galveston for the paving of 29th street. In doing this work on this paving job there was some excavation work done. They were doing some sub-grading preparing the base for concrete slab and there had been a drain put in. 29th street had been paved with mud shell before Hetkes commenced his work. We were removing the mud shell preparatory to paving the street with concrete slab.

"The City of Galveston had an inspector on that job. Frank Jones did the team work on the job, he was a colored man. I did not have anything to do with keeping the time of those teams; the city inspector on the job kept the time of the teams. After the teams arrived at the work the City Engineering Department directed the manner in which they did the work. I had nothing to do with directing the teams. The teams were ordered under the jurisdiction of the City Engineering Department, and the loading was under the jurisdiction of the engineering department of the City of Galveston; the unloading was also under the jurisdiction of the City Engineering Department.

"I saw this plaintiff, James Beeman, he was lying on the curb suffering with an injured leg. I had not seen him before that on that day when he was injured. It was about nine o'clock when I saw him.

"I did not say to James Beeman on the morning he was injured and prior to his injury, that he would get 40 cents an hour, the same as the rest of the men were getting. I did not have any conversation with him about 40 cents an hour; I did not have any conversation with him at all. I did not direct him as to where to get his material to load on the wagon he was driving.

"On this morning when the men started to work at eight o'clock, they started hauling the submaterial off the street. I had some men working on graders and tractors and I did not have any tools, practically no tools on this job, and at that time the 14th street job was in progress. I got on a truck and went over to 14th street to get some tools and I was talking to Mr. Hetkes at the tool box, where the tools were, when another truck driver came up and told me a man was injured on the 29th street job. I went over to the 29th street job and a man was on the curb with a leg broken and I loaded him in a car, for the sake of mercy, and taken him to the hospital.

"I did not do any talking at the hospital; I did not give any directions or instructions at the hospital to the superintendent or the nurses.

"As superintendent for Mr. Hetkes, I did not have any authority to hire men to drive wagons. I had no authority to discharge them. I had no more authority to hire or fire a man to drive a team than I have authority to hire a yardman for you or fire a yardman for you.

"The night before this injury to James Beeman, I did tell Jones the number of wagons needed there the next day. I did not have any conversation with a man by the name of John Green about furnishing teams on that

job. The city inspector gave me the time of the teams working on the job. I kept the time in this way. The time was turned in to me in a bulk sum and I in turn turned it in to the office. I did not keep the times of each team, it was given to me in a bulk sum. I mean by 'bulk sum' if we had ten teams all working ten hours, or eight hours, that would be eighty hours, and they would give me the bulk sum of eighty hours. I did not keep the time of the drivers separately. I did not know the name of any of the drivers at all.

"The truck driver that came over and told me was in Mr. Hetkes' employ. He came from the 29th street and Q to the job on 14th and Church and told me that a man was hurt, he didn't specify any one man. It was this man (indicating plaintiff). I am Hetkes' General Foreman. As his general foreman, as to what my duties consisted, I will say, that is according to what the job is. On this one particular job it was to take care of the grade.

"My duties on the 29th street job was to prepare 29th street for paving. That was all of the duty I had to perform at that time. Mr. Hetkes had that job under contract with the City of Galveston.

"The driver of the truck that came down on 14th street came there for the purpose of getting steel and not for the purpose of telling me about the man being injured on the other job.

"I took James Beeman to the hospital. John Green accompanied me to the hospital with Beeman. I can't say that John Green accompanied me at my request, I don't know about that; we loaded him into the car, four of us loaded him into the car. I hardly undertook to load him into the car by myself. I did ask for the assistance of these other men that did assist me. I would have done that for any injured person, absolutely; I did it last week for one."

Frank Jones, the witness for defendant, testified:

"My name is Frank Jones and I live in the City of Galveston. I have lived here about nineteen years. I have been teaming, contracting team work. I was engaged in that business in October 1927.

"I did have a contract with H. J. Hetkes in October, 1927, for furnishing teams on the 29th street paving job. Hetkes agreed to pay me for the teams I furnished 87½ cents an hour per team. Mr. Hetkes and his foreman had nothing to do with hiring and firing the drivers on those teams. The city inspector ordered the teams and discharged them as he saw fit. Hetkes and his foreman had nothing to do with the hiring and firing of the drivers. The city inspector directed the teams after they got on the job, he told them what to do. I was there frequently during the time this work was going on, I went back to the job all through the day.

"The drivers of the teams were paid $3.00 per day. That was the regular wages of the drivers of the teams at that time on the job. That was the regular pay of team drivers in the City of Galveston.

"I know James Beeman, the man sitting there (indicating); I remember when he was injured out on 29th street. I don't remember the exact date. I did not see him on that day before he was hurt. I did not start in to work on the morning that he was injured. I did not tell him to get up on the wagon and drive the team and to go down on Avenue Q. I did not tell him to drive down to the Avenue Q job and they would put him to work.

"I first saw James Beeman in the hospital. I did not get to see him the same day he was hurt, when I went out there he was in the operating room and I did not get to see him. I first saw him on the Sunday following the day he was hurt. I did have a talk with him. I asked him how he got out there on the job and he said 'Sonny boy was there and he told me to go out there where the work was and I would find a team and go to work.' That is the words he spoke to me.

"Beeman did not ask me to pay him for any time he worked there that day. He never did ask me for any pay.

"Beeman wasn't working for me. I cannot tell you who the city inspector on that job was exactly. I don't know, they had so many at that time. They had a city inspector by the name of Anderson, they had a great many inspectors from time to time, and one or the other of them would go around and look at the different jobs that was being done.

"I know the name of Mr. Hetkes' foreman that was on this job, Mr. Roy Colville. The city inspector was on the job all the time."

John Green, a witness for plaintiff, testified that he was the owner of the team that plaintiff was driving at the time he was injured; and further testified:

"I did not have any conversation with Mr. Hetkes about sending a team over there. Neither did I have any conversation with Mr. Roy Colville about sending a team over there; I had no conversation with them at all. I did not receive any directions that morning, I received no instructions from them at all. I did not present any bill to Jones for that work that the team did that day, he told me that he hadn't done anything, that he broke his leg the first load.

"I did not employ Beeman. I had not seen him before that day when I got up there where the accident occurred. I did not tell him to go there and drive that team. I did not know how he came there of my own knowledge. I had gone down town to find a driver for this team.

"I know Jones, he is a teaming contractor, he has three teams. Before that time he had not worked any of my teams. I was not employed to go on jobs to do hauling for him before that. That is the only time I furnished Jones any teams. My cousin took the team over there that morning. I do not know of my own knowledge who ordered my cousin to take the team over to 29th street.

"I did not furnish any driver with that team that morning. I do not know anything about who employed Beeman.

"I do know that I had gone down town to the city to get someone to go back there and drive that team. Mr. Roy did not tell me to go to town and look for a driver, I had not seen Mr. Roy. I told my cousin to take both teams down there and I went to town to get a man."

The evidence further shows that, under the contract between the city and Hetkes, all shell, surplus sand, or other material on the streets contracted to be paved by Hetkes, which the city desired to use upon other streets, would be hauled at the expense of the city, and such of this shell and surplus material as the city did not desire to use on other streets, would become the property of the contractor and would be removed at his expense.

The material which the appellee was assisting to haul away was desired by the city for use on other streets, and its removal was under the direction of a city street inspector who was present at the time and place of appellee's injury and directing the work.

The foregoing is a full statement of all of the evidence bearing upon the question of appellee's employment by Hetkes, and we agree with appellant that it does not raise an issue of such employment, express or implied.

The only evidence tending to show such employment is the statement in appellee's testimony that "Mr. Roy put me to work. Mr. Roy was a white man. After Mr. Roy put me to work, I had worked about two hours when I got hurt. Mr. Roy said he was going to pay me 40 cents an hour." Conceding that the evidence is sufficient to show that the Mr. Roy referred to by the plaintiff in this statement was the contractor's foreman, Mr. Roy Colville, we think the subsequent statements made by plaintiff in his testimony destroy any probative force of his statement above quoted. Standing alone, his first statement might have raised the issue of his employment by Colville. His further testimony is:

"When he first came up there and spoke to me, I didn't know what his name was, but I heard him called 'Mr. Roy' and he told me, he said 'go over there and go to work.' He told me to get down on the side of the street where they were hauling the dirt from; he told me to work down there in the ditch where they were grading.

"As to whether he told me to get up on the wagon, I will say, I was already on the wagon. I did not get up on the wagon before he talked to me, no, when I drove up there he told me, 'to go over there and get a load.' He put me to work and I drove the team up there. A man told me to get on the wagon and drive the team down there and I would find a man to tell me what to do. Yes, sir, a man, Frank Jones, told me to get on the wagon and drive the team down there. Mr. Roy didn't tell me to get on the wagon and drive the team down there, he told me to 'go to work.'

"As to my driving the team for Frank Jones, I will say, I was not driving the team for Frank Jones as I knows of, he told me to go down there and I would find a man down there and the man would put me to work. Frank Jones told me that and I went on down there and did find a man. Frank Jones told me to get on the wagon and drive the team down there and I would find a man and he would find something for me to do, he would tell me what to do. I don't know where Frank Jones went to.

"Frank Jones did not tell me they would pay me 40 cents an hour, he didn't tell me anything about what they would pay me. When I went down there I asked him what they were paying and he stated that they were paying 40 cents an hour. I asked a white man, I told you. The white man was Mr. Roy and he said they were paying all of them 40 cents an hour for driving the team, Mr. Roy told me that. Frank Jones just told me to get on the wagon and drive the team down there and they would tell me what to do."

When the first statement of plaintiff is considered along with his detailed explanation of his conversation with Colville, the only reasonable inference that can be drawn from his testimony is that after being directed to get up on the wagon by Frank Jones, the independent contractor for hauling this material, and drive to the place from which the material was being taken "where he would find a man who would find something for him to do and tell him what to do," he followed these directions, and when he got to the place indicated, Mr. Colville told him to drive down on the side of the street and go to work, and, in answer to plaintiff's question as to what he would be paid, told him he would get 40 cents an hour. If Colville had this conversation with the plaintiff and had authority to employ him to drive the wagon, we do not think, under the circumstances shown by the undisputed evidence, his statements to the plaintiff could be considered as an express or implied contract of employment. Plaintiff came to the place as the driver of the wagon of the independent contractor, Jones, who had the contract for the removal

of the material, and Colville's direction to plaintiff as to where to drive the wagon and to go to work, and his reply to plaintiff's question as to what he would be paid, cannot be considered as a promise by Colville's principal to pay plaintiff for his services. Tilling v. Indemnity Ins. Co. (Tex. Civ. App.) 283 S.W. 565; Security Union Casualty Co. v. M. & V. Tank Co. (Tex. Civ. App.) 12 S.W.(2d) 1062; Lumberman's Reciprocal Association v. Carter (Tex. Civ. App.) 19 S.W.(2d) 346.

If, however, plaintiff's testimony can be deemed sufficient to raise an issue of his employment by Colville, the undisputed testimony of both Hetkes and Colville shows that he was not authorized to employ the plaintiff. It goes without saying, that, unless appellee was an employee of Hetkes at the time he was injured, he has no cause of action against appellant. The evidence being insufficient to raise the issue of such employment, the trial court erred in refusing to instruct the jury to find a verdict for appellant.

There is nothing in the record to indicate that the evidence upon this issue was not fully developed upon the trial of the case. Upon this state of the record, the judgment must be reversed and judgment here rendered for appellant, and it has been so ordered.

Reversed and rendered.